IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

v.

MICHAEL DWAYNE BANKS,

    Defendant.

CRIMINAL ACTION NO.
1:22-CR-00414-SCJ-RDC

## **FINAL REPORT AND RECOMMENDATION**

This case is before the Court on Defendant Michael Dwayne Banks's Motion to Suppress Statements and Evidence, [Doc. 51]. The Government filed a preliminary response to this Motion on December 1, 2023, [Doc. 58]. On December 6, 2023, this Court held an evidentiary hearing. [R. 59].  On February 20, 2024, Mr. Banks filed a post-hearing brief, [Doc. 65].  The Government filed its response on April 5, 2024, [Doc. 69], and Mr. Banks filed his reply brief on May 1, 2024, [Doc. 70].  Following a teleconference addressing Mr. Banks's Fifth Amendment claim on June 5, 2024, Mr. Banks filed a sur-reply on June 18, 2024, [Doc.73]. The Government filed its sur-

response on July 3, 2024, [Doc. 74].

Following review of Defendant's pleadings, the Government's responses, the transcript of the evidentiary hearing [Doc. 64] (hereafter "Tr."), a portion of Task Force Officer ("TFO") Caleb Jackson's Grand Jury testimony [Def's Ex. D], and the audio recording of that testimony [Def's Ex. 5], this matter is now ripe for judicial review.

### Factual and procedural background

Mr. Banks is named in a five count Indictment charging him with offenses involving the distribution of controlled substances and possession of firearms in connection with these offenses. [Doc. 24]. Count One charges him with conspiring with those known and unknown to the Grand Jury to distribute fentanyl, cocaine, and marijuana from August 23-24, 2022, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), (b)(1)(C), (b)(1)(D) and 846.[1] *Id.* Count Two charges him with aiding and abetting others in the attempted distribution of fentanyl on or about August 24, 2022, in violation of 21 U.S.C.§§ 841 (b)(1)(B), 846 and 18 U.S.C. § 2. *Id.*  He is charged in

---

[1]  Victor Reynoso was named in a Criminal Complaint on May 25, 2022. [1:22-mj-767; R. 1]. In this Complaint, he and Mr. Banks are alleged to have conspired to distribute controlled substances in violation of 21 U.S.C. §§ 841, 846 and 841(b)(1)(C). It also alleges that they possessed firearms in furtherance of these offenses in violation of 18 U.S.C. §924(c)(1). *Id.* Mr. Reynoso has not been indicted.[R. 23].

Counts Three and Five with aiding and abetting the possession of multiple firearms and ammunition in connection with those drug trafficking offenses on or about August 24, 2022, in violation of 18 U.S.C. §§ 924 (c)(1)(A)(i) and 2. And in Count Four, he is charged with aiding and abetting others in the distribution of cocaine and marijuana in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), (b)(1)(D) and 18 U.S.C. §2 on the same date. *Id.*

This Indictment arises from a 2022 drug trafficking investigation conducted by agents with the Drug Enforcement Agency ("DEA"). The investigation was led by TFO Caleb Jackson. [Tr. at 16]. A confidential source ("CS") provided his officers with information regarding a narcotics broker based in the Atlanta area. [Tr. at 16-17]. The officers began negotiating with the broker who was coordinating a potential transaction with the assistance of a Mexican narcotics broker. [Tr. at 17-18]. The Mexican broker eventually agreed to provide an undercover officer ("UC1") with a sample of fentanyl-laced pills on August 23, 2022. [Tr. at 20]. On that day, DEA agents were conducting surveillance when the Mexican broker's associate – Victor Reynoso – arrived in a black Dodge Ram truck at the pre-arranged location to deliver the requested sample. [Tr. at 20-21]. The agents observed Mr. Reynoso as he provided 500 fentanyl-laced pills to UC1's courier (another undercover agent "UC2"). [Tr. at 22].

Following that transaction, UC1 ordered 5,000 fentanyl-laced pills from the Mexican broker. [Tr. at 22].  On August 24, 2022, the Mexican broker texted UC1 with directions to the new meeting location – a church parking lot in south Fulton county. [Tr. at 26].  The broker's messages also revealed that the person who would be making the delivery was located within walking distance of this location.[*Id.*]. Agents descended on the area to set up surveillance. [Tr. at 28, 32, 54, 78]. They eventually located the black Dodge Ram truck Mr. Reynoso had driven during the first transaction. [Tr. at 28].  His truck was parked in front of a home located at 5447 Big Horn Pass; a very short distance from the church parking lot. [Tr. at 27]. Just before this second transaction was to occur, the Mexican broker informed UC1 that his order only contained 4,000 pills. [Tr. at 32].  UC1 instructed the broker to make up the difference by adding 1,000 white bar-shaped pills (also fentanyl-laced) that the broker had previously offered to sell. [Tr. at  32].  While they were discussing this new arrangement via text, the agents observed another Dodge Ram truck, gray in color, leave the Big Horn Pass residence and drive toward the church parking lot. [*Id.*].

As the gray truck traveled to the meet location, the Mexican broker agreed to provide the additional pills. [Tr. at 32; 35-36]. The truck then returned to the residence. [Tr. at 33]. Agents saw one person exit the truck, enter the home, and return

to the truck about 15 minutes later. [Tr. at 32].   Based on these observations, they assumed that the person had retrieved the additional pills from the residence. [Tr. at 33]. The Mexican broker confirmed with UC1 that a total of 5,000 pills would be delivered. [Tr. at 32]. The officers continued to observe the truck as it returned to the church parking lot. [Tr. at 66-67].

Once the truck parked in the church parking lot, the agents noticed that the driver – later identified as Micheal Dwayne Banks – was seated in the driver's seat. [Tr. at 40]. Mr. Reynoso was seated in the back passenger's seat. [Tr. at 38]. UC2 arrived at the location in his vehicle and parked beside the truck. [Tr. at 37]. Mr. Reynoso entered UC2's vehicle with grocery bags filled with pills that he displayed to the undercover officer. [Tr. at 39]. The officer discovered 5000 pills inside the bags - small, circular blue pills resembling Oxycodone and white bar-shaped pills that looked like Xanax pills. [Tr. at 41-42]. Mr. Reynoso was immediately arrested. [*Id.*].

Officers removed Mr. Banks from the front seat of his truck. [Tr. at 42]. As he was stepping out of his vehicle, a loaded Glock handgun with an extended magazine and a cellphone fell from his waistband. [Tr. at 44-45]. Officers discovered another cellphone on the driver's seat. [Tr. at 45]. Mr. Banks was handcuffed while agents secured his truck and removed Mr. Reynoso from UC2's vehicle. [Tr. at 41].  As Mr. Banks stood near his truck, TFO Jackson read his *Miranda* rights from a DEA 13A

card before attempting to ask him any questions. [Tr. at 48; Gov't Ex. 10]. This form
states:

> Before we ask you any questions, you must understand: You have the
> right to remain silent. Anything you say can be used against you in court.
> You  have the right to talk to a lawyer for advice before we ask you any
> questions and  to have a lawyer with you during questioning. If you cannot
> afford a lawyer, one will be appointed for you before any questioning if
> you wish. Do you understand? Are you willing to answer some
> questions?

[Gov't Ex. 10].

Once TFO Jackson finished reading the card,  Mr. Banks stated that he wanted to
speak to an attorney before being questioned. [Tr. at 51]. Officer Jackson then
approached Mr. Reynoso to determine if he was willing to be interviewed. [Tr. at 52].
After Mr. Reynoso invoked his right to counsel as well, TFO Jackson consulted with
his fellow officers. [*Id.*]. They decided to conduct a knock and talk at Mr. Banks's
Big Horn Pass residence in an attempt to speak to any occupants.  [*Id.*].  Officer
Jackson testified that he walked over to Mr. Banks and informed him of their decision.
[*Id.*].  In response, Mr. Banks asked if he could call his girlfriend. [Tr. at 52-53]. TFO
Jackson then asked him if anyone other than his girlfriend was in the home. [Tr. at
53]. Mr. Banks claimed that only his girlfriend was inside the residence and requested

that the officers retrieve his socks and underwear. [Tr. at 52].[2] TFO Jackson described

this exchange:

> Q. (By Ms. Ojeda): Did you tell Mr. Banks that you were going to the house at Big Horn Pass?
>
> A. (TFO Jackson): I did.
>
> Q. And what did you say to him?
>
> A. I told him we were going to go over there to knock on the door and attempt to speak to anyone who was at the residence. He began repeatedly asking if he could call his girlfriend. At that point, the conversation turned to where I was trying to confirm that he was saying that his girlfriend was over at the house. And I did ask him if anyone else was present at the house for the purpose of determining if there was any kind of safety issue with us going over there.

---

[2]    The parties disagree about a portion of this conversation between TFO Jackson and Mr. Banks regarding this request. The transcript of TFO Jackson's Grand Jury testimony regarding this matter states: "He [Banks] originally stated it was his girlfriend's house but he was requesting that we go over there regardless of any intent. We had to execute a search warrant in order to get him some socks, which indicated to me that he's at least staying the night there." (Def. Ex. D; Doc. 65-4 at 3-4). An audio recording of this portion of the Officer's testimony was also submitted. (Def. Ex. 5; Doc 65-5). Based on Mr. Banks's reading of the transcript and review of the audio recording, he claims TFO Jackson  suggested that he needed to execute a search warrant in order to obtain the clothing; testimony he claims undermines Officer Jackson's credibility. [Doc. 65 at 7-8].

The Government disagrees, asserting that the transcript contains a punctuation error and should read: "He [Banks] originally stated it was his girlfriend's house, but he was requesting that we go over there, regardless of any intent we had to execute a search warrant, in order to get him some socks."  [Doc. 69 at 6]. This Court agrees. This reading of the Officer's testimony is consistent with his recitation of the events preceding the knock and talk he offered during the evidentiary hearing and with the audio recording of his testimony. [Tr. at 104-105]. Thus, this Court adopts the Government's explanation of this portion of TFO Jackson's Grand Jury testimony.  See, *Viehman v. Schweiker*, 679 F.2d 223, 228 (11th Cir. 1982)("Credibility determinations lie solely within the province of the trier of fact.").

Q. Did Mr. Banks say anything else to you?

A. He did eventually ask for some socks and underwear. If we could get some socks and underwear from the house.

Q. How soon --- approximately how soon after reading Mr. Banks' Miranda rights did you tell him that you were going to the house?

A. I would estimate somewhere between five and ten minutes.

Q. Did you threaten Mr. Banks in any way to talk to you?

A. I did not.

Q. When you asked him the question about whether anyone was at the house, was the purpose of that question to elicit incriminating information from him?

A. No.

[Tr. at 52-53].

TFO Jackson explained that knock and talk encounters (as opposed to scenarios involving the execution of search warrants) create a "friendlier environment" which may encourage cooperation from occupants of a residence, thereby avoiding a potential risk of harm to the officers. [Tr. at 56]. He also stated that he believed Mr. Banks's statements were freely and voluntarily offered, describing their conversation as casual. [Tr. at 53].

When asked by this Court to explain why he informed Mr. Banks of his team's plan to conduct the knock and talk, TFO Jackson stated that "…we are looking for

some sort of response that's going to indicate that maybe it's not a great idea. If there are other co-conspirators who are at the house, that might be -- you know, have a vested interest in either what's inside or the transaction in the first place and either the fear of going to jail or being apprehended by the police, we don't want to walk up on a situation that is going to be dangerous for us or at least any more dangerous than it generally is." [Tr. at 54].

Defense Counsel also inquired about the Officer's motivation, asking him to explain why he questioned Mr. Banks after informing him of their next investigative step:

> A. (TFO Jackson): Well, in the course of my investigative experience as a law enforcement officer, I have historically had individuals not tell me the truth, so I would not necessarily take what he said at face value, without further investigation and confirming myself.
>
> Q. (Ms. Barron): So his answer to your question didn't matter?
>
> A. Again, not necessarily. It's -- we are kind of speaking in hypotheticals, I guess.
>
> Q. No. I'm speaking in actuals. I'm trying to understand if his answer to your question did not determine whether you were going to go to that house, why did you ask it?
>
> A. Because information can be gleaned from things, other than maybe what's directly being stated. Looking for how things are being said and what the response is. And, again, if someone wants to, you know, volunteer additional information that I'm not requesting, far be it for me to prevent them from doing that.

Q. So you are asking him questions in order to glean information from him, like credibility or whether he's going to volunteer something else?

A. Yeah. Not necessarily the purpose –

Q. That's what you just said, Officer Jackson.

A. Again, the purpose of me asking that is to primarily identify if there is anyone at the house that wishes to do us harm, if we were to go over there and knock on the door.

Q. A (sic) secondarily what was the purpose?

A. Again, it's primarily to identify if there are people there at the house.

Q. And secondarily?

A. What residual information comes from it doesn't necessarily prevent me from attempting to ascertain what's the safest way to proceed.

[Tr. at 80-81].

Following this conversation, TFO Jackson and other law enforcement officers went to Mr. Banks's residence to conduct the knock and talk. [Tr. at 55]. They joined several officers who had already been stationed on the perimeter of the two-story home prior to the transaction. [Tr. at 54, 78]. TFO Jackson stated that he and DEA Agent Michael Tooley approached the front door. [Tr. at 57]. TFO Jackson knocked on the door and announced that they were police officers. [Tr. at 58-59]. He testified that he heard a man's voice coming from inside the house. [Tr. at 59].

Agent Tooley testified that he saw a Black man through a window panel near the front door as the man walked downstairs. [Tr. at 145]. He said that the man made eye contact with him, "held his finger up in the air as if he was indicating, you know, hold on for a minute," and then went back upstairs. [*Id*.]. Both officers testified that they were surprised to see the man because Mr. Banks claimed that only his girlfriend was in his home. [Tr. at 60, 145]. They continued to knock and identify themselves, but no one came to the door. [Tr. at 146].

After several minutes passed, both officers became concerned that the occupants were potentially destroying evidence. [Tr. at 147]. After consulting with an Assistant United States Attorney and other law enforcement officers, they decided to forcibly breach the door. [Tr. at 148, 152]. Once inside, they announced themselves again and ordered the occupants to come downstairs. [Tr. at 153].  Mr. Banks's girlfriend - Cecelia Futch - and the man the Agent Tooley saw through the window - Jordan Lyles - complied. [Tr. at 62]. They were both handcuffed as the officers proceeded to conduct a protective sweep throughout the residence. [Tr. at 61-62].

TFO Jackson testified that he noticed several items of evidentiary value during the five minute protective sweep including "fresh marijuana in several bags strown about on the living room floor as well as it looked to be bags of pills that were on a table in the kitchen area, some of which appeared to be the same pills that we had purchased

from Victor Reynoso the day before." [Tr. at  62].  He also observed weapons that appeared to be firearms. [*Id*.].

Agent Tooley testified that he saw marijuana in the residence "as soon as we went to do the security sweep in the bathroom, you couldn't help but see the weed in the toilet.  I don't recall the pills on the kitchen table. I don't recall, you know how they were packaged. I remember having (sic) pills. Numerous firearms stuck out in my mind…firearms immediately stick out in my mind, when you see them and I remember seeing multiple firearms in the residence at the time of the security sweep." [Tr. at 154].

After the home was cleared of occupants, TFO Jackson submitted an affidavit to this Court seeking a residential search warrant. [Gov't Ex. 11]. In his affidavit, he explained that his agents observed two drug transactions. [*Id.* at 8-9]. The first occurred on August 23, 2022, with Mr. Reynoso acting as the courier for a Mexican drug dealer. [*Id.* at 8].  The affidavit revealed that Mr. Reynoso drove a black Dodge Ram truck when he approached an undercover officer at their meeting location.[*Id.* at 9; ℙ 19].  It also states that Mr. Reynoso "exchanged approximately 500 pills for $2,5000 in Official Advance Funds." [*Id.* at 9; ℙ 20]. A second transaction occurred the next day. [*Id*. at 10]. Officer Jackson stated that an undercover officer arranged to purchase an additional 5,000 pills from the same supplier. [*Id*. at 10; ℙ24.]  He

explained that the supplier agreed to the transaction and suggested that they conduct the sale in south Fulton county – 3595 Union Rd. SW. [*Id.* at ⁋ 23].  The agents began to canvas the neighborhood near the location in anticipate of this transaction.  [*Id.*]. They subsequently observed a black Dodge Ram truck in front of a home near this area  and confirmed that this was the same truck Mr. Reynoso drove during the first transaction. [Gov't  Ex. 11 at ⁋ 23].

TFO Jackson further explained that approximately twenty minutes before the second transaction, the agents observed "two males exit the residence at 5447 Big Horn Pass, enter a grey Dodge Ram truck and travel to 3595 Union Rd. SW where they remained parked for several minutes before returning to the address." [Gov't  Ex. 11 at 10; ⁋ 24]. Officer Jackson stated that the agents believed the truck returned to the home to retrieve additional fentanyl-laced pills when the supplier informed the undercover agent that his order was short by 1,000 pills.[*Id.*].

After the truck returned to the meeting location, TFO Jackson stated that it was parked in the church parking lot. [Gov't Ex. 11 at 11-12; ⁋ 26].  The undercover agent arrived, and Mr. Reynoso entered his vehicle with a shopping bag. [*Id.* at  ⁋ 27]. The affidavit states that once Mr. Reynoso entered the undercover agent's vehicle, Mr. Reynoso explained that he selected the meeting location "because 'it was close to the house' and invited UC2 to come to the home to 'chill and smoke' (which UC2 took

to mean smoke marijuana)." [*Id.*].  Mr. Reynoso then showed UC2 what appeared to be Xanax pills and five bags of blue circular pills believed to be fentanyl-laced pills. [*Id.*].

Mr. Banks and Mr. Reynoso were arrested. TFO Jackson stated that "agents informed Mr. Banks that they were going to attempt to speak with anyone  inside the 5447 Big Horn Pass residence. BANKS told agents his girlfriend, Cecilia Futch, was the only person at the house." [Govt Ex. 11 at 11*;* ⁋ 29].  He explained that agents went to the residence, knocked on the door and identified themselves as police officers.  He also stated that an agent "looked through a window near the front door and observed a Black  male inside display an index finder (which the agent took to mean "wait") before turning around and walking up a staircase visible from the front door." [*Id.* at ⁋ 30]. After several minutes passed without the man returning to the door despite the fact that they continued to knock and announce, he stated that the officers believed the man would not return to the door and was "possibly destroying evidence or fortifying a position of advantage." [*Id.* at 12; ⁋ 30]. As a result, he and his officers forced entry into the residence.  [*Id.* at ⁋ 31].

The affidavit also reveals that after the officers entered the home, "[a]gents observed in plain view in the living room floor of the residence a large amount of marijuana. Directly adjacent to the living room near the kitchen, in plain view on a

table, agents observed at least one rifle and one pistol with what appeared to be a suppressor attached. On the same table, agents observed in plain view pills contained in a clear plastic bag that were similar in shape, size and color to pills that were delivered during the 500-pill sample buy on August 23, 2022." [Gov't Ex. 11 at  12; ⁋ 31]. Officer Jackson claimed that probable cause existed to support issuance of a search warrant based on the significant amount of contraband his team observed in plain view and because Mr. Banks and Mr. Reynoso were observed leaving the residence just prior to consummating the narcotics transaction. [Gov't Ex. 11 at 12].

Based on Officer Jackson's sworn statements, this Court found that the affidavit provided probable cause that the residence was being used to store controlled substances and justified issuance of a search warrant. [Gov't Ex. 11 at 17]. During execution of the warrant, officers located a small amount of marijuana on the living floor, cocaine, four firearms, substances that appeared to be psilocybin mushrooms, a scale, pills and a pill press. [Tr. at 68].  The officers also discovered a significant amount of marijuana in a toilet in an upstairs bathroom that rendered the toilet inoperable. [Tr. at 69].

On August 31, 2022, TFO Jackson submitted an affidavit seeking issuance of a search warrant for Mr. Banks's two cellphones. [Gov't Ex. 15]. The factual basis offered in support of this requested warrant mirrored the facts submitted in the

affidavit for the residential search warrant, with TFO Jackson adding that "[b]ased on the evidence obtained from surveillance immediately before the five thousand pill transaction, the fact that multiple individuals were communicating with the UC via cell phone to coordinate the drug transaction, the possession of both SUBJECT TELEPHONES by BANKS during his arrest at that same narcotics transaction, and confirmation that BANKS resides at 5447 Big Horn Pass (a residence containing various narcotics to include similar pills to those delivered by REYNOSO and BANKS), along with my training and experience, I submit that there is probable cause to believe that the SUBJECT TELEPHONES were used to facilitate drug trafficking activities." [Gov't Ex. 15 at 11]. Magistrate Judge J. Elizabeth McBath concluded that probable cause had been established and approved the search warrant. [*Id.* at 14].

Mr. Banks was subsequently named in the pending Indictment with offenses involving conspiracy to distribute  controlled substances and possession of firearms in connection with these charges. [Doc. 24]. Following his arraignment, he filed this Motion seeking suppression of the statements obtained after he invoked his *Miranda* rights and any evidence seized from his home and his cellphones. [Doc. 51]. After careful review of his pleadings, the Government's responses, and the applicable law, this Court **RECOMMENDS** that the Motion to Suppress be **DENIED.**

### The parties' contentions

In Mr. Banks's Motion seeking suppression of his statements, he claims that his statements were not voluntarily made and were unlawfully used to conduct the "knock and talk, which led to the perceived exigency justifying the warrantless protective sweep." [Doc. 65 at 15]. According to Mr. Banks, TFO Jackson's questioning constituted an "interrogation" that allowed him to "use[d] the information gleaned from his questioning to further the investigation." [*Id.* at 14; Doc. 73 at 2-3]. This alleged Fifth Amendment violation, he avers, requires suppression of the evidence seized from his home and his cellphones because the officers' "decision to conduct the knock-and-talk was made largely based on what [he] revealed in his post-arrest, post-invocation statements." [*Id.* at 15; Doc. 73 at 4-5].[3]

Mr. Banks also attacks both the warrantless entry into his home and the subsequent search conducted pursuant to a search warrant. [Doc. 65 at 16, 20]. He asserts that the warrantless entry was unconstitutional because the officers created the exigency that led to the search and TFO Jackson "misrepresented in his search warrant affidavit the evidence he found in plain view." [*Id.* at 16]. Furthermore, he avers that the

---

[3]   The Government initially argued that Mr. Banks had failed to establish that he maintained standing in order to challenge the searches of the residence and the cellphones seized following his arrest. [Doc. 58]. However, it has now conceded that evidence introduced during the evidentiary hearing established that he possessed legitimate expectations of privacy in both his residence and the two cellphones that were in his possession. [Doc. 69 at 11]. Accordingly, this Court will address all of the constitutional claims raised by Mr. Banks.

circumstances preceding the officers' forced entry his home did not establish "sufficient cause to believe there would be narcotics in the home, much less that someone would be destroying evidence." [*Id.* at 18]. The lack of probable cause and sufficient exigency to justify the warrantless sweep, he claims, requires suppression of the evidence "as fruit of the poisonous tree." [Doc. 65 at 19].

In regard to the veracity of the affidavits, Mr. Banks alleges that TFO Jackson's misstatements "were at least made in reckless disregard for the truth." [Doc. 65 at 23]. He specifically claims that the Officer's assertions that he observed in plain view a large amount of marijuana and pills resembling those sold by Mr. Reynoso during first drug transaction are false. [*Id.* at 22-23]. He also argues that because the affidavits are based on his illegally obtained post-*Miranda* statements and these false representations, both search warrants are constitutionally infirm. [*Id.* at 23-24]. Lastly, Mr. Banks argues that both warrants fail to establish a sufficient nexus between the alleged drug transactions and his property. [Doc. 65 at 23]. "Without the nexus to the pills involved in the Reynoso conspiracy," he submits, there was not a "fair probability that contraband or evidence of a crime would be found" in his residence.[*Id.*]

The Government urges this Court to deny Mr. Banks's request to suppress his statements because he was not subjected to a custodial interrogation when he

voluntarily responded to TFO Jackson's questions.[4] [Doc. 69 at 13-15]. It asserts that the questions were only for the purpose of clarifying Mr. Banks's requests to call his girlfriend "and then determining if there were any safety issues at the house since law enforcement was going to the residence." [Doc. 74 at 2]. This attempt to confirm the number of occupants in the home, the Government insists, was proper pursuant to *Miranda's* public safety exception. [Doc. 69 at 5; Doc.74 at 2-3].

The Government also disputes Mr. Banks's claim that any evidence seized from his home and his cellphones should be suppressed as "fruit of the poisonous tree" because his alleged involuntary statements were improperly used to justify the warrantless entry and to obtain both search warrants. [Doc. 69 at 15]. It submits that the officers planned to conduct the knock and talk despite Mr. Banks's statements, so they were not determinative of their investigative strategy. [*Id*. at 16]. Consequently, it concludes, he fails to carry his burden of establishing that Officer Jackson's alleged unlawful questioning was the "but for" cause of the discovery of the evidence; a necessary prerequisite to suppression. [*Id*.].

---

[4]  Although the Government has informed the Court that it does not plan to introduce Mr. Banks's statements in its case-in-chief at trial, it maintains that these statements were voluntarily offered and urges this Court to reject Mr. Banks's contrary assessment of the legality of his statements. [Doc. 65 at 5; fn. 1].

The Government also alleges that suppression of the evidence is not required because its officers acted reasonably when they entered the residence to prevent destruction of evidence.[Doc. 69 at 21]. Rather than unlawfully creating exigent circumstances to justify their warrantless entry, it asserts, the officers "were authorized to consider the developing facts and circumstances to execute an exigency search to prevent evidence destruction – which they successfully stopped." [*Id.* at 22]. If the officers' conduct preceding an exigency is reasonable and they did not threaten Mr. Banks in violation of the Fourth Amendment, the Government continues, "warrantless entry to prevent the destruction of evidence is reasonable and allowed." [*Id*. at 21].

As for Mr. Banks's assertion that Officer Jackson submitted false and misleading statements in his affidavits, the Government claims that the factual summaries offered in his affidavits were corroborated by Agent Tooley's testimony detailing the conspirators' conduct during both transactions and the "unchallenged portion of paragraph 31 stat[ing] that two firearms and at least some marijuana were observed inside the residence, the residence from which Banks and Reynoso had departed in tow with nearly 4,000 M30 (fentanyl) pills and 1,000 fake Xanax pills." [Doc. 69 at 30]. Because Mr. Banks failed to establish that Officer Jackson "deliberately or recklessly provided false information in the affidavit," it avers, this claim is meritless.

[Doc. 69 at 29]. The Government also argues that even if Officer Jackson's alleged falsehoods are excised from the affidavits, the remaining facts support the probable cause findings. [*Id*. at 30].

Finally, in response to Mr. Banks's claim that the affidavits lacked probable cause, the Government submits that assertion is also meritless. [Doc. 69 at 29, 31]. It argues that the conspirators' apparent retrieval of additional narcotics from the home before consummation of the second transaction, coupled with the controlled substances and firearms the officers observed in plain view during the protective sweep, provided ample probable cause to justify issuance of search warrants for the residence and the cellphones. [*Id*. at 26-27, 30]. The Government also avers that the *Leon* good faith exception prohibits suppression of the evidence even if this Court finds the affidavits lacked probable cause because its officers reasonably relied in good faith on the search warrants issued by the Magistrate Judges. [*Id*. at 33].

In rebuttal, Mr. Banks reiterates his assertion that TFO Jackson's claim that he had decided to conduct the knock and talk before Mr. Banks made his admissions "is not credible." [Doc. 70 at 2]. He also maintains that the purpose of the knock and talk was to search the residence, and that TFO Jackson "was hoping to create an exigency that would justify the full intrusion he had planned for."[*Id*. at 5]. Because the investigative steps taken by the officers were unreasonable, he submits, the forcible

entry was unconstitutional, and all evidence seized as a result must be suppressed. [*Id.* at 6].

### Discussion

**A. Mr. Banks's post-*Miranda* interrogation did not violate the Fifth Amendment.**

The Fifth Amendment provides that: "No person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.  To ensure a suspect's protection against compelled self-incrimination, the Supreme Court established in *Miranda v. Arizona*, 384 U.S. 436 (1966), "'certain procedural safeguards that require police to advise criminal suspects of their rights under the Fifth and Fourteenth Amendments before commencing custodial interrogation.'" *Florida v. Powell*, 559 U.S. 50, 59 (2010) (<u>citing</u>, *Duckworth v. Egan*, 492 U.S. 195, 201 (1989)). The  Fifth Amendment prohibits the use of an involuntary confession against a defendant in a criminal trial. *Bram v. United States,* 168 U.S. 532, 542 (1897); *United States v. Vera,* 701 F.2d 1349, 1365 (11th Cir.1983). *Colorado v. Connelly,* 479 U.S. 157, 170 (1986); *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1978) .[5]

---

[5]    In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions rendered by the Fifth Circuit before October 1, 1981.

Pursuant to *Miranda*, prior to conducting a custodial interrogation, law enforcement officers must warn a suspect that he has a "right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda*, 384 U.S. at 444. [T]he term "interrogation" refers not only to express questioning, but also to "its functional equivalent" defined as "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

Before the Government may introduce a suspect's uncounseled statement made during a custodial interrogation, it must show that the suspect made a voluntary, knowing and intelligent waiver of his privilege against self-incrimination and his right to counsel. *Miranda*, 384 U.S. at 475-476; *Moran v. Burbine*, 475 U.S. 412 (1986). This showing has two aspects: (1) relinquishment of the right must have been the product of the suspect's free and deliberate choice (rather than intimidation, coercion, or deception), and (2) the waiver must have been made with the full awareness of both the right being abandoned and the consequences of the decision to abandon that right. *Moran*, 475 U.S. at 421-422; *United States v. Lall*, 607 F.3d 1277, 1283 (11th Cir. 2010).

Whether a statement was voluntarily given must be examined in light of the totality of the circumstances including whether the accused was subjected to "an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession." See, *Schneckloth v. Bustamonte,* 412 U.S. 218, 226 (1973); *United States v. Thompson*, 422 F.3d 1285, 1295 (11th Cir. 2005); *Hubbard v. Haley*, 317 F.3d 1245, 1252 (11th Cir. 2003). "Government coercion is a necessary predicate to a finding of involuntariness under the Fifth Amendment." *Thompson*, 422 F.3rd at 1297. And in the absence of "any evidence of psychological or physical coercion on the part of the agents, there is no basis for declaring [defendant's] statements and consent to search involuntary." *United States v. Barbour,* 70 F.3d 580, 585 (11th Cir. 1995). With these principles in mind, the undersigned turns to the errors alleged by Mr. Banks.

In the instant case, the parties agree that Mr. Banks was properly advised of his *Miranda* rights following his arrest and that he unequivocally invoked his right to remain silent. [Doc. 65 at 5; Doc. 69 at 5]. However, Mr. Banks claims that TFO Jackson's decision to inform him of his intent to conduct a knock and talk and then proceed to question him concerning the number of occupants in his home amounted to an "interrogation." This questioning contravenes the Fifth Amendment, he argues, because his answer "would be an admission that [he] lived in the home officers were

24

replanning to search and where they ultimately found a significant amount of drugs. When Jackson asked [him] who else would be at the home, any response would *necessarily* implicate him as an occupant of the home." [Doc. 73 at 4] (emphasis in original).

The Government argues that TFO Jackson did not "interrogate" Mr. Banks, nor ask any questions "'for the purpose of eliciting any incriminating responses for furthering the investigation.'" [Doc. 69 at 5]. It argues that Officer Jackson was simply informing Mr. Banks of his plan to conduct the knock and talk as a matter of courtesy. Mr. Banks's repeated requests to call his girlfriend and retrieve his clothing, it submits, indicate that he voluntarily engaged in the conversation. [*Id*. at 14]. Because Officer Jackson's question regarding the occupants of the home was only "to determine issues related to safety," the Government avers, Mr. Banks was not subjected to an "interrogation" pursuant to *Miranda*. [Doc. 69 at 6; Doc 74 at 1-2].

Although the testimonial evidence supports Mr. Banks's characterization of his exchange with Officer Jackson, Circuit precedent forecloses his requested relief. As stated above, an "interrogation" consists of not only "express questioning, but also [ ] any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police <u>should know are reasonably likely to elicit an incriminating response from the suspect</u>." *Rhode Island*,   446 U.S. at 301-302

(emphasis added).  Furthermore, evidence that a suspect "was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege." *Miranda*, 384 U.S. at 476.

In the case at bar, TFO Jackson's months-long investigation led to the successful consummation of the initial narcotics transaction revealing Mr. Reynoso's connection to his Mexican supplier. Armed with this evidence, the officers arranged the second transaction. It was during this second operation that the officers first discovered Mr. Banks and his connection to Mr. Reynoso.  Both officers admitted being surprised by Mr. Banks's presence that day and his role as Mr. Reynoso's driver. TFO Jackson and his team suspected that the residence was a stash house based on both men's access to the home before the second transaction and the apparent retrieval of addition pills from the home at the Mexican drug supplier's direction. What they had yet to confirm was Mr. Banks's personal connection to the residence. Whether he was a short-term visitor, owner or innocent bystander was unclear. By asking Mr. Banks if anyone other than his girlfriend was in the home, TFO Jackson confirmed "that Mr. Banks lived at or was at least staying the night at the home." [Doc. 73 at 4]. This confirmation could elevate Mr. Banks's role in the conspiracy from unsuspecting driver to occupant of the residence.

Under these circumstances, a reasonable officer *should have known* that any questions related to Mr. Banks's knowledge of others residing in the suspected stash house would likely elicit an incriminating response. Additionally, Officer Jackson testified that one of the goals of his line of questioning was to obtain "information…other than maybe what's directly being stated." [Tr. at 80]. Even though this Court's analysis is not based on the subjective intent of a particular officer, TFO Jackson candidly admitted that he expected Mr. Banks to lie in response to his questions, explaining: "I have historically had individuals not tell me the truth, so I would not necessarily take what he said at face value, without further investigation and confirming myself." [*Id.*].

Although Officer Jackson's conduct suggests that he was attempting to persuade (or "cajole") Mr. Banks into disclosing incriminating information, this questioning does not require suppression of his  answers "in the absence of any other aggravating circumstances suggesting coercion on the part of [the officer*]." United States v. Castaneda-Castaneda*, 729 F.2d 1360, 1363 (11th Cir. 1984) ("Although the [defendants] were subjected to police deception in a foreign environment, their interrogation was sufficiently free of coercive elements to render their confessions voluntary.").  Officer Jackson testified that he didn't threaten Mr. Banks, nor did he promise anything to entice him to answer his questions; describing the tone of their

conversation as casual. [Tr. at 53]. Because the Officer's questioning of Mr. Banks did not involve "any other aggravating circumstances suggesting coercion," this Court finds Mr. Banks's post-*Miranda* statements were not obtained in violation of the Fifth Amendment. [6] See Also, *United States v. Middleton*, 245 F. App'x 867, 871–72 (11th Cir. 2007) (where court concluded that although defendant's admission was made after police officers falsely informed him that his wife had confessed, "this single interrogation trick—in the absence of any other aggravating circumstances suggesting coercion on the part of Investigator Wade—does not automatically render [his] waiver involuntary."); cf. *Lall*, 697 F. 3d at 1284 (finding defendant's confession was inadmissible based on several undisputed aggravating factors including his isolation from his family during the police interview and being falsely informed that his family would be protected from future prosecution; noting that "[p]olice misrepresentations of law, on the other hand, are much more likely to render a suspect's confession involuntary.").

In the event the District Court concludes that Mr. Banks's post-*Miranda* statements were involuntary, this Court will consider his claim that TFO Jackson's

---

[6]   The Government also argues that TFO Jackson's questions were not impermissible based on *Miranda's* public safety exception that "allows officers to question a suspect absent *Miranda* warnings when necessary to protect either themselves or the general public." [Doc. 74 at 2]. Because this Court concludes that the statements were lawfully obtained, it will not address this alternative theory.

utilization of his statements requires suppression of the evidence subsequently seized. [Doc. 65 at 14-15]. Because the officers' "decision to conduct the knock-and-talk was made largely based on what Mr. Banks revealed in his post-arrest, post-invocation statements," he argues, the fruit of the search must be suppressed. [*Id.* at 15].

The Government disputes this claim as well, asserting that the officers' decision to conduct the knock and talk was not dependent on Mr. Banks's response to Officer Jackson's questions. Because the officers were planning to conduct the knock and talk regardless of Mr. Banks's statements, it argues, his answers had no bearing on their investigative strategy.  [Doc. 69 at 16]. Moreover, it asserts that because "lawful means of discovery were actively being pursued prior to the occurrence of the [alleged] illegal conduct," the inevitable-discovery doctrine dooms Mr. Banks's claim. [Doc. 74 at 4-5].

This Court agrees. TFO Jackson testified that he informed Mr. Banks <u>before</u> he made his post-*Miranda* statements that he planned to conduct a knock and talk at his residence after consulting with his team. [Tr. at 52]. He also stated that his team "would have probably attempted the knock and talk prior to executing a search warrant" even if Mr. Banks had claimed no one was in his home. [Tr. at 80]. Because the officers had already decided to conduct the knock and talk, there is no causal connection between Mr. Banks's statements and the officers' observation of the

contraband.  <u>See</u>, *Segura v. United States,* 468 U.S. 796, 815 (1984), ("Evidence is not to be excluded if the connection between the illegal police conduct and the discovery and seizure of the evidence is 'so attenuated as to dissipate the taint.")(citations omitted); <u>See</u> <u>Also</u>, *Wong Sun v. U.S*, 371 U.S. 471, 488 (1963) (where court found evidence need not be suppressed "simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is whether, granting the establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."). As a result, Mr. Banks cannot establish that the interrogation was the "but for" cause of the subsequent observation and seizure of the incriminating evidence.

Mr. Banks's claim also fails because the discovery of the contraband was inevitable. "If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means—here the volunteers' search—then the deterrence rationale has so little basis that the evidence should be received." *Nix v. Williams,* 467 U.S. 431, 444 (1984). As the Government explains, the officers were in active pursuit of the suspects and were "developing facts and circumstances to execute an exigency search to prevent

evidence destruction." [Doc. 74 at 2]. Both officers provided extensive details of the undercover agents' interaction with the conspirators, the communications shared via cellphone before and during the transactions, and the dynamic nature of the on-doing investigation. *United States v. Senese,* 798 F. App'x 499, 505 (11th Cir. 2020) (where court found the inevitable-discovery doctrine was applicable because the defendant was being actively pursued by agents during "an ongoing drug trafficking investigation,…and had been "interdicted twice in the preceding year, and was observed at a residence associated with a drug trafficker."). Because the record establishes that Officer Jackson's team was actively pursuing the conspirators, the observation and seizure of the contraband was inevitable.

**B. The protective sweep and subsequent search of the residence did not infringe the Fourth Amendment.**

Mr. Banks also argues that both the warrantless entry into his residence and the search conducted pursuant to the search warrant ran afoul of the Fourth Amendment's proscription against unreasonable searches and seizures. The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or Affirmation, and particularly describing the place to be searched, and the persons or things to be seized." This Amendment requires all searches and seizure to be reasonable, and that

warrants will not be issued "unless probable cause is properly established and the scope of the authorized search is set out with particularity." *Payton v. New York,* 445 U.S. 573, 584, 590 (1980)("[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant").  Additionally, "[i]t is a 'basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable.' " *Brigham City v. Stuart,* 547 U.S. 398, 403 (2006) (quoting, *Groh v. Ramirez,* 540 U.S. 551, 559 (2004)).

In some circumstances, this presumption may be overcome because "the ultimate touchstone of the Fourth Amendment is 'reasonableness.' " *Brigham City*, *547 U. S. at* 403; See Also, *Michigan v. Fisher,* 558 U.S. 45, 47 (2009) *(per curiam)*. As a result, the warrant requirement is subject to certain reasonable exceptions. *Brigham City,* 547 U.S. at 403. One of those exceptions applies when " 'the exigencies of the situation' make the needs of law enforcement so compelling that [a] warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona,* 437 U.S. 385, 394 (1978). A warrantless search has been found to be permissible in order to prevent the imminent destruction of evidence, but both probable cause and exigent circumstances must exist. *United States v. Morales,* 868 F.2d 1562, 1575 (11th Cir. 1989); See Also, *United States v. Mikell*, 102 F.3d 470, 475 (11th Cir. 1996)

("Exigent circumstances exist when authorities have reason to believe that evidence is in danger of being destroyed or removed.).

To determine if there is an exigency, this Court must consider whether the facts would lead an objectively "reasonable, experienced agent to believe that evidence might be destroyed before a warrant could be secured." *United States v. Tobin,* 923 F.2d 1506, 1510 (1991), quoting *United States v. Rivera*, 825 F.2d 152, 156 (7th Cir. 1987)). However, any warrantless entry based on "exigent circumstances" must be supported by a genuine exigency. *Kentucky v. King*, 563 U.S. 452, 461, 131 S. Ct. 1849, 1857, 179 L. Ed. 2d 865 (2011) ("[A]lthough exigent circumstances may justify a warrantless probable cause entry into the home, they will not do so if the exigent circumstances were manufactured by the agents.")(internal quotation marks omitted)).

1. **Exigent circumstances justifying the protective sweep were not unlawfully manufactured by law enforcement officers.**

Mr. Banks claims that the warrantless entry into his home was unconstitutional because the officers' alleged reason for their forced entry – concern for destruction of incriminating evidence – was created to "justify the full intrusion [TFO Jackson] had planned for." [Doc. 70 at 5]. Because the investigative steps the officers took leading up to the knock and talk were unreasonable, he avers, this "officer-created" exigency resulted in a violation of the Fourth Amendment.

The Government disagrees, asserting that the officers' reason for entering the residence was not based on a contrived excuse. It claims the officers lawfully entered Mr. Banks's home to prevent the imminent destruction of evidence and that considering "the totality of circumstances known by DEA, it was reasonable to infer that individuals were inside the home destroying evidence. And that's exactly what they were doing." [Doc. 69 at 19].

The Government's position is well-taken. This Circuit recognizes that "the need to invoke the exigent circumstances exception to the warrant requirement is 'particularly compelling in narcotics cases' because narcotics can be so quickly destroyed." *Tobin,* 923 F.2d at 1510 (quoting, *United States v. Young,* 909 F.2d 442, 446 (11th Cir. 1990)) and *United States v. Burgos*, 720 F.2d 1520, 1526 (11th Cir. 1983)("'exigent circumstances' refers to a situation where the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action."). Prior to knocking on Mr. Banks's front door, the officers observed he and Mr. Reynoso return to his home to apparently retrieve the additional fentanyl-laced pills that had been ordered by UC1. They also observed Mr. Banks as he sat in the front seat of his vehicle during the transfer of the narcotics to UC2. Following that transaction, the officers repeatedly knocked and announced their presence at Mr. Banks's home, identifying themselves as police officers. They testified that Mr. Lyles - an occupant they had no prior

knowledge of - approached the window adjacent to the front door. After acknowledging their presence, he never returned to the door. The occupant they assumed was in the home – Mr. Banks's girlfriend – also failed to respond to their attempt to communicate. The occupants' evasiveness, coupled with the conspirators' apparent retrieval of narcotics from the residence moments before the drug transaction, led the officers to reasonably conclude that the occupants were potentially destroying incriminating evidence.

Accordingly, this Court finds that the officers' decision to forcibly enter Mr. Banks's home was reasonable under these circumstances. Because the exigency exception is applicable in this context, the breach and protective sweep that followed did not violate the Fourth Amendment. *United States v. Reid,* 69 F.3d 1109, 1114 (11th Cir. 1995)(where court found agents had probable cause to believe cocaine stored in a residence was at imminent risk of destruction, justifying a warrantless entry into the home.).

### 2. <u>The search warrant affidavits were supported by probable cause.</u>

As noted above, "[t]he Fourth Amendment requires that a search warrant be issued only when there is probable cause to believe that an offense has been committed and that evidence exists at the place for which the warrant is requested." *United States v. Betancourt*, 734 F.2d 750, 754 (11th Cir. 1984). Search warrants are

presumed to be validly issued. *Franks v. Delaware*, 438 U.S. 154, 171 (1978). The defendant bears the burden of establishing that a warrant was defective or executed improperly. *United States v. Van Horn*, 789 F.2d 1492, 1500 (11th Cir. 1986); *United States v. Osborne*, 630 F.2d 374, 377 (5th Cir. 1980). Probable cause to support the issuance of a search warrant exists when the totality of the circumstances establish that there is a fair probability of finding contraband or evidence at a particular location. See, *United States v. Noriega*, 676 F.3d 1252, 1261 (11th Cir. 2012); *United States v. Kapordelis*, 569 F.3d 1291, 1310 (11th Cir. 2009); *United States v. Gonzalez*, 940 F.2d 1413, 1419 (11th Cir. 1991). Further, "[P]robable cause is a fluid concept--turning on the assessment of probabilities in particular factual contexts[.]" *Illinois v. Gates*, 462 U.S. 213, 232 (1983). It "deals 'with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Gates*, 462 U.S. at 241 (quoting, *Brinegar v. United States*, 338 U.S. 160, 175 (1949)). Moreover, "[p]robable cause does not require overwhelmingly convincing evidence, but only 'reasonably trustworthy information.'" *United States v. Angulo-Hurtado*, 165 F. Supp. 2d 1363, 1376 (N.D. Ga. 2001) (quoting *Ortega v. Christian*, 85 F.3d 1521, 1524 (11th Cir. 1996)).

"[T]o determine whether an affidavit lacked sufficient indicia of probable cause, [courts] must look only at the face of the affidavit." *United States v. Robinson*, 336

F.3d 1293, 1296 (11th Cir. 2003). An affidavit will be found deficient if it contains conclusory allegations and fails to provide sufficient information to conclude "that evidence or contraband will probably be found at the premises to be searched." *United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002) (internal quotation marks omitted); *Gates*, 462 U.S. at 239 ("Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others.  In order to ensure that such an abdication of the magistrate's duty does not occur, courts must continue to conscientiously review the sufficiency of affidavits on which warrants are issued."). In deciding whether to issue a search warrant, the magistrate judge may rely upon the conclusions of an experienced law enforcement affiant since "[c]onduct innocent in the eyes of the untrained may carry entirely different 'messages' to the experienced or trained observer." *United States v. Gonzalez*, 969 F.2d 999, 1004 (11th Cir. 1992) (quoting, *United States v. Fouche*, 776 F.2d 1398, 1403-04 (9th Cir. 1985)); See Also, *United States v. Kirk*, 781 F.2d 1498, 1505 (11th Cir. 1986) ("Observations of fellow officers of the Government engaged in a common investigation are plainly a reliable basis for a warrant applied for by one of their number.") (citations omitted).

Further, to justify a search the circumstances must indicate why evidence of the alleged illegal activity will likely be found in a particular place. *Gates*, 462 U.S.

at 238; *Warden v. Hayden*, 387 U.S. 294, 307(1967); *United States v. Griffin*, 555 F.2d 1323, 1325 (5th Cir. 1977). Therefore, an affidavit "must establish  a nexus between the place to be searched and things to be seized, such that there is a substantial basis to believe that the things to be seized will be found in the place searched." *Ellison v. Balinski*, 625 F.3d 953, 958 (6th Cir. 2010). "[T]he nexus between the objects to be seized and the premises searched can be established from the particular circumstances involved and need not rest on direct observation." *United States v. Lockett*, 674 F.2d 843, 846 (11th Cir. 1982).  Lastly, "probable cause must exist when the magistrate judge issues the search warrant," *United States v. Santa*, 236 F.3d 662, 672 (11th Cir. 2000) (quoting,*United States v. Harris*, 20 F.3d 445, 450 (11th Cir. 1994)), because a search cannot be made legal by the evidence that is subsequently discovered. *United States v. Di Re*, 332 U.S. 581, 595 (1948).

In the instant case, Mr. Banks submits that the affidavits were not supported by probable cause because TFO Jackson mischaracterized the contraband he observed in plain view during the security sweep, and he failed to establish a nexus between Mr. Reynoso's criminal conduct and his residence and cellphones.[1]He argues that Officer Jackson's claim that he observed small, blue M30 pills in plain view during the five minute security sweep strains credulity, especially because the contraband appears obscured in the photographs taken following the officers' entry into his home.

He raises the same criticism regarding the "large" amount of marijuana the Officer swears to have seen, submitting that "the only items in plain view were the small baggie of user-quantity marijuana on the floor…there was no testimony that larger bags of marijuana the government now claims were strown about the house in plain view." [Doc. 70 at 8-9].

The Government contests these assertions, contending that Mr. Banks's allegation that TFO Jackson's affidavit included false statements is baseless, and that "even taking out the affiant's statement that during the security sweep he observed a "large" amount of marijuana or pills resembling the fentanyl pills seized less than an hour earlier, ample probable cause remains to support issuance of the residential search warrant." [Doc. 69 at 29].

The Government's rebuttal is persuasive. As it emphasizes, the affidavit meticulously describes the initial drug transaction, the second transaction where officers observed both conspirators leaving Mr. Banks's residence after apparently obtaining additional narcotics at the direction of the Mexican dealer, and Mr. Banks's presence during the distribution of thousands of fentanyl-laced pills. The Government also notes that Mr. Banks does not dispute the statements in the affidavit that reveal two firearms and at least a small amount of marijuana were observed in plain view during the security sweep. All of these factors established a reasonable probability

that "an offense [had] been committed and that evidence exist[ed] at the place for which the warrant [was] requested." *Betancourt*, 734 F.2d at 754.[7]

The affidavit also established a link between Mr. Banks's home and the criminal conduct witnessed by the officers. As stated above, the officers observed both conspirators as they returned to Mr. Banks's residence to apparently obtain additional fentanyl-laced pills as directed by the Mexican supplier. They also had reason to believe marijuana was being stored in his home based on Mr. Reynoso's invitation to UC2 to join him there to "chill and smoke." This conduct supports a finding that evidence of drug trafficking activity would likely be found in the home. *Kapordelis,* 569 F.3d at 1310–1312*)*(nexus between items to be seized and defendant's home can be established circumstantially where contraband is capable of being hidden in residence); <u>See</u> <u>Also</u>, *United States v. Green*, 634 F.2d 222, 226 (5ᵗʰ Cir. 1981)("The justification for allowing a search of a person's residence when that person is suspected of criminal activity is the common-sense realization that one tends to conceal fruits and instrumentalities of a crime in a place to which easy access may be had and in which privacy is nevertheless maintained.") and *United States v. Anton,*

---

[7]  As for Mr. Banks's assertion that TFO Jackson falsely stated that he observed in plain view a large amount of marijuana in the living room and pills resembling those sold by Mr. Reynoso on a kitchen table, this Court will not rely on this statement in its analysis of his claimed errors. Accordingly, Mr. Banks's argument regarding  the veracity of this statement will not be considered.

546 F.3d 1355, 1358 (11th Cir. 2008)("Evidence that the defendant is in possession of contraband that is of the type that would normally expect to be hidden at their residence will support a search.").

The same holds true for the affidavit submitted for issuance of a search warrant for the cellphones. TFO Jackson explained that Mr. Banks was in possession of a firearm and two cellphones during the second drug transaction. He stated that throughout the investigation, "multiple individuals were communicating with the UC via cell phone to coordinate the drug transaction." [Gov't Ex. 15 at 9]. Because "[c]ell phones have become important tools in facilitating coordination and communication among members of criminal enterprises, and provide valuable incriminating information about dangerous criminals," *Riley v. California*, 573 U.S. 373, 401 (2014), Officer Jackson's affidavit establishes a sufficient nexus between Mr. Banks's cellphones and the alleged criminal conduct. See Also, *United States v Henry*, No. 1:09-CR-522-1-TCB-GGB, 2010 WL 5559207, at *10 (N.D. Ga. Dec. 7, 2010) (finding officer's affidavit setting forth background information regarding narcotics conspiracy provided probable cause to lawfully search defendant's computer and cell phone).

Because this Court concludes that both affidavits were supported by probable cause and that the criminal conduct observed during the investigation established a

sufficient nexus to Mr. Banks's residence and his cellphones, his constitutional challenges are meritless. Accordingly, the Government's alternative claim that *Leon's* good faith exception undermines Mr. Banks's constitutional claims will not be addressed.

**CONCLUSION**

For the reasons stated above, this Court **RECOMMENDS** that Mr. Banks's Motion to Suppress Statements and  Evidence [Doc. 105] be **DENIED**.  Having now addressed all referred pretrial matters relating to Mr. Banks and having not been advised of any impediments to the scheduling of a trial as to him, this case is **CERTIFIED READY FOR TRIAL**.

**IT IS SO RECOMMENDED** this 5th day of August 2024.

REGINA D. CANNON
United States Magistrate Judge